UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

OUSSAMA EL OMARI, an individual
and United States Citizen residing in the
State of North Carolina,

                         Plaintiff,

       - against -

RAS AL KHAIMAH FREE TRADE ZONE
AUTHORITY, a/k/a R.A.K. FREE TRADE
ZONE AUTHORITY, a/k/a RAKFTZA,
a corporation organized under the laws of
Ras Al Khaimah, United Arab Emirates,

KREAB (USA) INC., a corporation
organized under the laws of the State
of New York, and

SHEIKH SAUD BIN SAQR AL QASIMI,
an individual and United Arab Emirates
Citizen, residing in the United Arab
Emirates, and Emir of  Ras Al Khaimah,
United Arab Emirates, sued in his
individual, and official capacity,

                         Defendants.

-------------------------------------------------------x

**FIRST AMENDED COMPLAINT**

Case No.: 1:16-cv-3895 (NRB)(SN)

     NOW COMES OUSSAMA EL OMARI, Plaintiff in the above referenced action, by and

through counsel, MOORE INTERNATIONAL LAW PLLC, as and for his First Amended

Complaint, states as follows:

### *NATURE OF THE ACTION*

    1)      This is a suit for damages against the Defendants, jointly and severally, by

Plaintiff, Oussama El Omari ("El Omari"), who was employed as a foreign worker for many

successful and award winning years by the Ras Al Khaimah Free Trade Zone Authority ("RAKFTZA"), located in Ras Al Khaimah ("RAK"), United Arab Emirates ("UAE"). RAK is one of seven emirates composing the UAE. El Omari was hired initially in 1997 by the RAKFTZA, by and through, Sheikh Faisal bin Saqr Al Qassimi ("Sh. Faisal"), and then a written agreement was entered into the next year on April 1, 1998 ("the Agreement"), hiring El Omari as Project and Marketing Manager to help create, operate, and promote the Ras Al Khiamah Free Trade Zone ("RAKFTZ"). 14 years later, El Omari was terminated on May 28, 2012 ("the Termination Date"), after a smear report on the operation of the RAKFTZ was commissioned from New York based, Defendant, Kreab (USA) Inc. ("Kreab"), by the new Ruler, H.H. Sheikh Saud bin Saqr Al Qasimi ("Sh. Saud"). On the Termination Date, El Omari held the position of CEO and Director General of the RAKFTZA, and had served on the RAKFTZA Board of Directors for 12 years since 2000. Sh. Faisal was replaced as Chairman of the RAKFTZA by Sh. Saud the following year in 2013. At the time of his termination, El Omari's contracted pay was AED120,000 per month, or expressed in U.S. dollars, was US$32,688 per month.

2)      El Omari contested his termination in RAK, and exhausted his legal remedies in RAK, and was unable to invoke the jurisdiction of the RAK Rulers Court to enforce his contact rights under the terms of the Agreement. After Sh. Faisal was removed as Chairman of the RAKFTZA, El Omari was, and remains today, persecuted in the RAK Rulers Court, *in absentia,* without due process of law.

3)      El Omari has suffered, *inter alia*, loss of end of service monies due and owing under the Agreement, out of pocket expenses, lost earnings from an inability to gain similar employment, emotional distress, and damage to his reputation.

4)      El Omari was caught in a Royal family conflict and power play beginning on or about October 27, 2010, when then Ruler of RAK, H.H. Sheikh Saqr bin Mohammad al Qassimi ("Sh. Saqr"), died, and his son, Sh. Saud, became Ruler of RAK., who appointed his son, H.H. Sheikh Mohammed bin Saud bin Saqr Al Qasimi ("Sh. Mohammed"), as Crown Prince, rather than Sh. Faisal. Sh. Saud began to take steps to consolidate power, and undermine and remove his brother, Sh. Faisal, from positions of power in RAK, including the Chairmanship of RAKFTZA. As a false pretext for removal of Sh. Faisal, Sh. Saud caused the engagement of a smear report from Kreab on the RAKFTZA operation of the RAKFTZ.

### THE PARTIES

5)      Plaintiff, El Omari, is an individual and citizen of the United States, and is resident of the State of North Carolina, at 2005 Riviera Ct., Raleigh, North Carolina.

6)      Defendant, Ras Al Khaimah Free Trade Zone Authority, is an agency or instrumentality of the RAK, which is a political subdivision of the UAE, a foreign state, within the meaning of 28 U.S.C. § 1330(b). RAKFTZA is a separate legal person, corporate or otherwise, and is an organ of a foreign state or political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof, and is neither a citizen of a State of the United States, nor created under the laws of any third country.

7)      Defendant, Ras Al Khaimah Free Trade Zone Authority, is a corporation created on May 1, 2000, under Article (5) of Decree No. 5 of 2000, known as "The RAK Free Zone Law", by decree of Sh. Saqr, then Ruler of RAK. Under Article (5), the RAKFTZA is established as an "independent authority" with "its own corporate identity" and "shall enjoy financial and administrative independence in respect of all its affairs and shall have full capacity

3

to act". Under Article (11), the RAKFTZA is managed by a five (5) member Board of Directors, and, under Article (12), the Board of Directors report to "H.H. the Ruler or Crown Prince and Deputy Ruler about the Free Zone operations". Under Article (6), the objectives of the RAKFTZA are "the setting up, promotion, development, management, administration, regulation, operation and construction of the appropriate facilities of the Free Zone". Under Article (2), three geographical areas were established and created as the "Free Zone". Under Article (3), imports into and exports from, the Free Zone, are exempted from customs and excise taxes, and companies and individuals are exempted from all taxes for operations conducted within the Free Zone. El Omari, Sh. Faisal, and three other individuals were appointed to the initial Board of Directors by another Decree No. 5 in 2000, issued by Sh. Saqr. El Omari remained on the Board of Directors until the Termination Date. The principal place of business of RAKFTZA is located at P.O. Box 10055, RAK, UAE. The RAKFTZA has promotion offices in other countries, set up by El Omari, in Cologne, Germany, Istanbul, Turkey, Mumbai, India, and until 2015, in New York, for promotion of RAK Free Trade Zone business.

       8)     The office of RAKFTZA in New York, was New York County based RAK Dubai Business Centre L.L.C., ("RAK Business Centre"), a limited liability company organized on April 7, 2008, under the laws of the State of New York. The RAK Business Centre was owned and controlled by RAKFTZA as the sole member. The RAK Business Centre was the alter ego and agent of RAKFTZA for the purpose of promoting the RAKFTZ in the United States market. Subsequently, Articles of Dissolution under Section 705 of the New York Limited Liability Company Law were filed on October 22, 2015, under the authority and personal signature of Shaikh Ahmad Saqer Mohamed Al Qasemi ("Sh. Ahmad"), the present Chairman of the RAKFTZA, who replaced Sh. Faisal by decree of Sh. Saud on March 5, 2013. Presently, the

RAK Business Centre remains a juridical person under Section 703(b) of the New York Limited Liability Company Law, which provides that "Upon dissolution of a limited liability company, the persons winding up the affairs of the limited liability company's affairs may … defend suits …."

9)      Defendant, Kreab (USA) Inc., is a corporation organized under the laws of the State of New York, and its principal place of business is located at 515 Madison Avenue, 34th Floor, New York, New York. On March 7, 2016, Kreab changed its name from Kreab Gavin Anderson (USA) Inc., to its present name, Kreab (USA) Inc. According to the New York State, Department of State, Division of Corporations, the Chief Executive Officer of Kreab (USA) Inc. is P.M Peje Emilsson, located at Kreab AB, Floragatan 13, Stockholm, Sweden, and the Principal Executive Office of Kreab (USA) Inc. is located at Strategy XXI Group Ltd., 515 Madison Avenue, 34th Floor, New York, New York. At all times relevant to this complaint, Andrew Frank ("Frank"), was the Managing Partner of Kreab at the New York office, and figured prominently in the fraud and termination of El Omari.

10)      Defendant, Sheikh Mohammed bin Saud bin Saqr Al Qasimi, is an individual and Citizen of the United Arab Emirates, residing in Ras Al Khaimah, United Arab Emirates, and is Emir of RAK, UAE, sued in his individual, and official capacity. As is common in the UAE, Sh. Saud is a member of a Royal Family having both government and private business positions and interests. Sh. Saud has been, and is, a private businessman, and simultaneously, has been the Emir and Ruler of the UAE emirate of RAK since 2010.

11)     This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. The amount in controversy is relief requested by Plaintiff, El Omari, of monetary damages for no less than the amount of Ten Million US Dollars (US$10,000,000).

12)     This court has subject matter jurisdiction over the RAKFTZA pursuant to 28 U.S.C. § 1330(a), under the commercial activity immunity exception, 28 U.S.C. § 1605(a)(2), to the Foreign Sovereign Immunities Act, based upon a commercial activity carried on in the United States by the foreign state, or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere, or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act caused a direct effect in the United States.

13)     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) and (f)(1).

14)     A company involved in the smear report scheme, The Arkin Group LLC, is a limited liability company organized under the laws of the State of New York, with its principal place of business located at 750 Lexington Avenue, 25th Floor, New York, New York, ("TAG").

15)     Another company involved in the smear report scheme is Strategy XXI Holdings, Inc., d/b/a Strategy XXI Partners, a corporation organized under the laws of the State of New York, created during scheme on July 11, 2011, with its principal place of business located at 515 Madison Avenue, 16th Floor, New York, New York, ("Strategy XXI"). Frank, the Managing Partner of Kreab at Kreab's New York office,  is also an employee and/or partner at Strategy XXI.

16)     Contacts with the United States by Sh. Saud, include but are not limited to:

(a) Sh. Saud resided in Ann Arbor, Michigan, and received a B.A. in Economics and Political Science from the University of Michigan, Ann Arbor, Michigan, on or about 1982.

(b) Sh. Saud was arrested for sexual assault of a hotel maid on criminal charges of Criminal Sexual Conduct in the 3rd and 4th Degrees, in Rochester, Minnesota, on June 10, 2005, during a visit to the Mayo Clinic in Rochester, Minnesota, where his now deceased father, Sh. Saqr, was a patient. The charges were dismissed approximately 6 months later for lack of probable cause. According to the Rochester police report, Sh. Saqr claimed Diplomatic Immunity at the time of his arrest, but the arresting officer reported contacting the U.S. Department of State, and was advised Sh. Saud was not on a list of foreign individuals with Diplomatic Immunity.

(c) Numerous meetings and exchange of emails with Kreab employees, in furtherance of the fraud, as further described herein.

(d) On a date after the Complaint was filed on May 25, 2016, but before July 31, 2016, unlawfully, falsely, and without due process of law, caused communication to U.S. Customs requesting the arrest of El Omari in the U.S. and to send El Omari to the UAE.

17) **Contacts by RAKFTZA with New York County**, a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, **include but are not limited to:**

(a) On behalf of RAKFTZA, in or about 2008, El Omari traveled to New York County to review a suitable New York promotion office location on Madison Avenue.

(b) On behalf of RAKFTZA, on April 7, 2008, El Omari, by and through New York County counsel, Patton Boggs LLP, 1185 Avenue of the Americas, 30th Floor, New York New York, caused the formation of the RAK Dubai Business Centre L.L.C., under the laws of the State of New York, with its principal office in New York County, with the RAKFTZA being the sole member. The RAK Dubai Business Centre was formed as a completely owned and controlled company, and was the alter ego, and agent, of RAKFTZA for promotion of the RAKFTZ in the United States market, like RAKFTZA's promotion offices in Germany, Turkey, and India. The RAK Dubai Business Centre L.L.C. was never fully operational due to the U.S. recession. The RAK Dubai Business Centre L.L.C. was dissolved on October 22, 2015, by a dissolution filing with the New York Department of State under the authority and personal signature of Sh. Ahmad, the present Chairman of the RAKFTZA, who replaced Sh. Faisal by decree of Sh. Saud on March 5, 2013. The Articles of Dissolution were filed by New York County counsel, Jones Day, 222 East 41st Street, New York, New York.

(c) On behalf of RAKFTZA, in or about 2008, El Omari opened a RAK Business Centre bank account, at a Bank of America office in New York County. After El Omari's termination in 2012, Sh. Saud's Advisor, Salem Ali Al Sharhan,

emailed Bank of America's office in New York County instructing that El Omari's name be removed from signing privileges.

(d) On behalf of RAKFTZA, in or about 2008, El Omari hired RAK Business Centre skeletal staff in New York County.

(e) On behalf of RAKFTZA, from 2010 to 2011, El Omari had email exchanges with Kreab's New York County office, regarding the TAG White Paper.

(f) On behalf of RAKFTZA, in 2011, El Omari traveled with RAKFTZA's in-house UAE legal advisor, Johnson George, to Kreab's New York County office, to complain of factual and other errors in the draft TAG White Paper.

18) The choice of jurisdiction clause under the Agreement is void. Since the Termination Date, El Omari has been denied basic due process of law in RAK to prosecute or defend claims under or related to the Agreement, to Wit: Upon termination of El Omari's employment on May 28, 2012, El Omari's UAE residency was illegally terminated on July 10, 2012, under UAE law applicable to foreign workers, which requires as a prerequisite, a signature by the foreign worker attesting that there are no labor payments outstanding, which El Omari did not sign, and as such, El Omari has been denied the ability to be freely present in the UAE to prosecute or defend claims. El Omari has also been denied the basis due process right of a hearing on his termination and end of services monies due and owing.

(a) First, El Omari directly requested RAKFTZA pay his contracted end of service monies due, to which there was no response.

(b) Second, El Omari's UAE attorneys officially requested a certificate waiving RAKFTZA immunity from suit from the RAK Rulers Court. The Rulers Court

9

first admitted receiving the waiver request and began its procedure, and then later denied even receipt of the waiver request.

(c) Third, El Omari wrote directly to Sh. Saud asking for his contracted end of service monies due and owing, to which there was no response.

(d) Fourth, in response to El Omari's contesting the lawfulness of his termination and seeking his contracted end of service monies due and owing, the RAKFTZA, after Sh. Faisal was replaced as Chairman, retaliated against El Omari by later asserting unsubstantiated and meritless allegations of wrongdoing by El Omari, and instituted civil and criminal suits against El Omari, *in absentia*, in the RAK Rulers Court. No proofs have ever been received against El Omari by the Rulers Court in support of any RAK claim or judgment.

## FACTUAL BACKGROUND

### A.  Success of the new RAKFTZ under El Omari beginning in 1997.

19)     El Omari was born in Morocco, educated at international schools in Morocco and France, and the U.S., and holds a B.A. in Chemical Engineering and an M.B.A. At all times relevant to this complaint, El Omari was a U.S. Citizen and had his permanent residence in the State of North Carolina.

20)     In March of 1997, El Omari was first hired in RAK, by Sh. Faisal, then Chairman of the RAKFTZA, under letter authority from Sh. Saqr, to head the pre-RAK Free Trade Zone, which later came into existence as the RAKFTZ in 2000, under The RAK Free Zone Law, by Decree No. 5 of Sh. Saqr.

21)    The Agreement, dated April 1, 1998, hired El Omari as Project and Marketing Manager, and included a number of contractual rights, including an unlimited period of service (Par. 3), a two month advance notice of termination requirement (Par. 5, Sec. A), and an end of service gratuity, to be calculated under UAE Labour Law No. 8 of 1980, as amended (Par. 10). The two text languages of the Agreement were English and Arabic (Par. 12). The Agreement text governed interpretation, and where silent, UAE Labour Law  No. 8, as amended, applied to conditions of service (Par. 13). Contract claims and disputes were to be resolved under jurisdiction of the RAK civil courts (Par. 14). There is no provision in the Agreement that the RAKFTZA was immune from suit. Nor was the RAKFTZA granted immunity from suit under the RAKFTZA establishment clause, Article (5) of The Free Trade Zone Law.

22)    During the fifteen year period between 1997 and 2012, El Omari reported directly to, and worked closely with, his direct supervisor, then RAKFTZA Chairman, Sh. Faisal. The period was characterized by successful growth of the RAKFTZ, the opening of promotion offices in Cologne, Germany, Istanbul, Turkey, and Mumbai, India, and New York, and award winning promotion and performance, with El Omari hosting and speaking at international trade zone conferences held in and out of the UAE. Among other awards, for 3 consecutive years, beginning in 2006, the RAKFTZ was recognized as the "Best Emerging Free Zone" at the Middle East Logistics Awards in Dubai, UAE. El Omari received promotions during his contract period, and on May 1, 2011, El Omari was awarded a new salary increase and promotion package by Sh. Faisal, and by that point in time El Omari held the posts of CEO & Director General of the RAKFTZA, and had sat on the RAKFTZA Board of Directors for 12 years.

**B.  Kreab (USA) Inc., New York**

23)     Defendant, Kreab (USA) Inc., holds itself out on its website (kreab.com) as a "small representative office in New York, which mainly focuses on financial and corporate communications" and serving corporate clients, not government clients, with a "tainted reputation":

**"Our expertise in New York**

**We have a small representative office in New York, which mainly focuses on financial and corporate communications. Together with our global network of offices and affiliated firms, we offer our clients, from the large multinational to the small local firm, the best specialists for their particular needs.**

**Corporate Communications**

**A company or organisation's reputation is one of the most decisive attributes in terms of how it is perceived by its primary and secondary stakeholders, be it customers, owners, decision makers or employees.**

A company with a tainted reputation and weak relations with influential stakeholders, whatever the reason, will suffer on the bottom line. We help our clients manage and obtain the desired profile and position on the markets in which they operate. This is crucial to ensure that the business is sustainable and profitable over time.

By employing Kreab as a strategic communications advisor, a company or organisation can continue to focus on its core business.

**Financial Communications**

**The financial market is ultimately a source of capital – the corporate lifeblood. Capital is gained from a range of investors, with whom a company needs to secure solid and good relations. Poor relations with or vague messages to this group of stakeholders may put capital at risk. Increasingly frequently, companies and the financial market have different interpretations which result in unnecessary losses or market fluctuations.**

The financial market is also highly regulated with policy makers constantly monitoring its operations. This adds to the need for appropriate relations with a broad range of stakeholders, beyond just investors. When Kreab advises clients on issues, it brings together financial and public affairs communications, including IPOs, deals requiring authority clearance or investments in publicly funded projects.

**Public Affairs**

**Our experts in public affairs communications help clients manage and build relations with decision and policy makers at all levels – local, regional, national and supranational.**

Decision makers are faced with opinions and requests at all times. Those who want to make their voice heard need to target decision makers effectively.

Through our broad network and extensive experience, we identify what is relevant to decision makers, attract their attention and point out how to contribute to their overarching vision and beliefs. Because understanding who decision makers and policy makers answer to is also key to attaining a share of voice, we always conduct a stakeholder analysis for each client and assignment."

## C.  The Arkin Group LLC, New York

24)      The Arkin Group LLC, holds itself out on its website (thearkingroup.com) with the acronym, "TAG", and as "an international risk consulting and intelligence firm" with high level U.S. "Central Intelligence Agency" background:

"The Arkin Group ("TAG") is an international risk consulting and intelligence firm. Our mission is to use strategic intelligence and prescient analysis to enable our clients to minimize risks and maximize payoffs when making critical business decisions. Founded in May 2000 by New York lawyer Stanley Arkin and Jack Devine, former chief of worldwide operations for the Central Intelligence Agency, the firm has completed hundreds of assignments in every region of the globe.

The Arkin Group is distinguished by our personal approach and tailored services. For each assignment, we create a unique game plan to achieve the client's specific goals. While we rely on a wide variety of investigative, forensic, communications and security tools, the hallmarks of the TAG methodology are sound analysis and well-sourced human intelligence.

The Arkin team of men and women hails from the nation's top universities and graduate programs and possesses experience in key U.S. government offices, international institutions and top consulting firms. We draw on vast domestic and international networks of area and functional experts, including intelligence professionals, law enforcement specialists, diplomats and policy makers, industry, business and finance analysts, leading academics, journalists, and specialized experts in forensic sciences and security."

## D.   Strategy XXI Holdings, Inc. d/b/a Strategy XXI Partners, New York

25)     Strategy XXI Holdings, Inc. d/b/a Strategy XXI Partners, holds itself out on its Strategy XXI Partners website as "strategic communications and public affairs advisor to companies, countries and causes":

"Protecting, Promoting and Managing Reputations Worldwide

ABOUT:

Strategy XXI Partners is a trusted strategic communications and public affairs advisor to companies, countries and causes.

We help our clients address complex challenges that affect their reputations. They turn to us to promote good news and protect against the fall-out from bad news, foster support for policy agendas and help expand market share.

The staff and senior advisors of Strategy XXI Partners have been counselors to C-suite leaders and heads of state. We have made our mark on Capitol Hill, Madison Avenue, Wall Street and civil society.

Now, combining local expertise with global perspective and transnational experience, we assist clients based overseas that face challenges in the U.S., as well as U.S.-based companies and institutions."

SERVICES:

**Communications and Positioning**

**Corporate Responsibility**

**Alliance and Stakeholder Engagement**

**Governments: Branding, Investment, Tourism, Information**

**Crisis and Issues Management**

**Risk Assessment and Corporate Reputation**

**Sustainability Consulting and Reporting**

## E.  The 2010 death of Sheihk Saqr, appointment of Sheihk Saud as new Ruler of RAK, and the Commission of a New York Smear Report on the Operations of the RAKFTZ as a Pretext to Remove Sheihk Saud's brother, RAKFTZA Chairman, Sheihk Faisal.

26)     On November 20, 2009, Kreab's employee, Davis Hodge ("Hodge") emailed a U.S. Public Relations Business Proposal ("the Kreab Proposal"), to El Omari, copied to Kreab's

14

employee, Andrew Frank ("Frank"), regarding promotion of the RAKFTZ in the United States market, without specifying any cost. El Omari operated the RAKFTZA promotion offices outside the UAE without outside public relations help, and, there was no proposed cost in the proposal. The Kreab Proposal was not accepted by El Omari.

27)     On October 27, 2010, Sh. Saqr died, and his successor, then Crown Prince, Sh. Saud, was appointed Ruler of RAK. Unknown to El Omari at the time, arising out of a Royal family succession conflict, the new Ruler of RAK, Sh. Saud, began taking steps to consolidate power and to remove his brother, Sh. Faisal, from positions of power in RAK.

28)     Amir Handjani ("Handjani"), employed by RAK Petroleum, UAE, had direct access to Sh. Saud, and on behalf of Sh. Saud, searched for and identified, The Arkin Group LLC, as the chosen entity to prepare a smear report on the operation of the RAKFTZ, which by implication, would smear the operating authority, RAKFTZA, and its Chairman, Sh. Faisal.

29)     TAG, the acronym used on its website, claims to have high level background in the U.S. Central Intelligence Agency. Later, Handjani would receive the draft TAG White Paper by email directly from Frank, and Handjani would then forward the draft TAG While Paper by email to Sh. Saud.

30)     El Omari did not commission any review of the RAKFTZ from Kreab, TAG or any other party, and did not know about any review of RAKFTZ operations until the review was underway. Sh. Saud approved the review, and El Omari had no choice but to cooperate with the review.

31)     On October 26, 2010, one day before Sh. Saqr died, Frank sent an email to Sh. Faisal, copied to El Omari, Handjani, and another Kreab employee, Jessica Levine, to arrange itinerary plans for a visit to RAK by TAG employee, Mark Christopher ("Christopher"). Frank

stated Christopher is "putting together the reports and he will have meetings on his own" and Frank specified with whom in RAK, Christopher would like to meet. Frank stated in this email that he, Frank, would also be traveling to RAK, and Frank would be joined by another Kreab employee, Hodge, who would be "meeting" with Christopher. Hodge had earlier submitted the failed Kreab Proposal in 2009. The positions named in this email, individuals Frank said Christopher would like to meet, far exceeded the scope of a basic review of RAKFTZ operations, as indicated by among other positions, the following persons: RAK Investment Authority, RAK foreign relations, the relationship between RAK and UAE, and activities of Iranian companies.

32)    On or about January of 2011, about 2 months after Sh. Saud became Ruler of RAK, Christopher travelled to RAK to conduct field research over a period of approximately 3 weeks. Neither Kreab nor TAG disclosed that TAG was in fact hired by Kreab, and not by the RAKFTZA. Frank pushed through the TAG review and handled all communication with TAG. At the time, El Omari still did not know why the TAG review was being conducted, or the scope of the review.

33)    In both the forthcoming draft and final versions of the smear report, styled by TAG as a "White Paper", ("the TAG White Paper"), TAG falsely stated that TAG was commissioned by the RAKFTZA to review RAKFTZ operations. TAG, in the methodology section in both the draft and final version of the TAG White Paper, stated the TAG factual research was conducted by Internet based research on RAKFTZ operations, but did not disclose sources, and stated that TAG conducted interviews in RAK, but withheld the names, and included negative hearsay statements by the unnamed sources. This secret source based fact research resulted in an unreliable factual basis of the TAG White Paper on its face.

34)     In the analysis section of both the draft and final versions of the TAG White Paper, TAG applied, *inter alia*, many unspecified legal obligations relating to operation of the RAKFTZ, and unspecified United States and United Nations legal sanctions law against Iran, without citing many of the laws or legal provisions, and without stating or analyzing what legal obligations, if any, applied to RAKFTZ operations. This resulted in an unreliable legal analysis on the face of the TAG White Paper.

35)     The resulting draft and final TAG White Paper falsely stated that TAG was commissioned by the RAKFTZA to review RAKFTZ operations, and on its face, smeared the RAKFTZ with unreliable, unsubstantiated, and negative legal conclusions, including a heavy emphasis on alleged Iranian businesses operating within the RAKFTZ in suggested violation of United States and United Nations sanctions law.

36)     On March 11, 2011, Frank emailed the Draft TAG White Paper, dated March 10, 2011, to Handjani.

37)     Also on March 11, 2011, Handjani then forwarded the Draft TAG White Paper received from Frank, to El Omari, Sh. Faisal, and to Sh. Saud.

38)     As such, Sh. Saud was kept informed of Kreab's smear progress by receiving the Draft TAG White Paper from Handjani, who received it from Frank. This cast the die and locked up the draft TAG White Paper from El Omari's efforts to correct fact errors and the overall negative thrust of the report.

39)     El Omari and others at the RAKFTZA were alarmed at factual errors and the overall negative thrust of the Draft TAG White Paper. El Omari and RAKFTZA in-house legal counsel, Johnson M. George ("George"), prepared responses to the draft TAG White Paper which were emailed from Johnson to Frank, which in the end resulted in no substantive change.

40)     Alarmed, and in an ultimately unsuccessful visit, El Omari and George traveled to New York to meet with Kreab, and express RAKFTZA concerns about the errors and negative Draft TAG White Paper. El Omari and George met with 2 Kreab employees, Frank, and Frank's supervisor, at the Kreab office in New York.

41)     On April 25, 2011, Frank delivered the final TAG White Paper by email to El Omari. The date on the delivered TAG White Paper was a future date, 3 days in the future, April 28, 2011. There were no substantive changes from the draft TAG White Paper.

42)     On May 1, 2011, Frank sent an email to El Omari stating that Frank was planning to meet that day with Sh. Saud and Handjani.

43)     After delivery of the final TAG White Paper, Sh. Saud personally called El Omari and directed El Omari to pay US$35,000 to Kreab for the TAG White Paper, out of RAKFTZA funds, over El Omari's objections, since the RAKFTZA did not commission the TAG White Paper nor found it acceptable.

44)     On July 7, 2011, Frank, also an employee and/or partner at Strategy XXI, used a Strategy XXI email account, and emailed a public relations business proposal from Strategy XXI to El Omari, with a proposed cost of US$15,000 per month ("the Strategy XXI Proposal"). The Strategy XXI Proposal used a letterhead with the look and feel of the RAKFTZ logo and letterhead, which it was unauthorized to use. El Omari did not accept the Strategy XXI Proposal. Frank attempted to  contact Sh. Saud in person at Sh. Saud's Palace in RAK about the Strategy XXI Proposal, but Sh. Saud was unresponsive and the meeting did not occur.

**F.     The 2012 Termination of El Omari as CEO and Director General of RAKFTZA by an Advisor to Sh. Saud, while Sh. Faisal is still Chairman of RAKFTZA.**

45)     On January 30, 2012, Sh. Saud issued Decree No. 3, appointing his Advisor, Salem Ali Al Sharhan ("Al Sharhan"), to oversee the RAKFTZA, without specifying Al

Sharhan's powers or duties. El Omari was still CEO and Director General, and Sh. Faisal was still Chairman of RAKFTZA. El Omari was directed by Sh. Saud to not speak with Sh. Faisal.

46) On May 28, 2012, while El Omari was traveling on RAKFTZA business outside the UAE, Sh. Saud signed and authorized a letter by Al Sharhan, under the same date, requesting authority to terminate El Omari as CEO and Director General.

47) On May 28, 2012, Al Sharhan emailed a letter to El Omari terminating El Omari from his positions of CEO and Director General of the RAKFTZA, with 1 month notice, effective June 30, 2012, for the stated reason of "re-structuring the RAKFTZ" ("the Termination Letter"). The Termination Letter breached the Agreement by 1) not giving the contracted 2 month notice of termination, and 2) failing to pay the contracted end of service gratuity. On the Termination Date, El Omari held the position of CEO and Director General of the RAKFTZA, at a pay rate of 120,000 United Arab Emirates Dirham (AED120,000) per month. The AED has been pegged to the U.S. Dollar since 1997 at an exchange rate of 1 U.S. dollar = 3.671 dirhams (1 dirham = US$0.2724). On the Termination date, El Omari's monthly pay in U.S. Dollars, under this exchange rate, was US$32,688 (120,000 dirham per month $^x$ 0.2724 US$ per dirham).

48) On May 29, 2012, while still outside the UAE on RAKFTZA business, and per instructions from Sh. Faisal, El Omari sent a reply email back to Al Sharhan, stating that Al Sharhan's Termination Letter was "disapproved" by Sh. Faisal, Chairman of the RAKFTZA, and that El Omari remained in his positions unless instructed otherwise by Sh. Faisal.

49) On July 10, 2012, El Omari's UAE residency was terminated and had 30 days to leave the UAE; El Omari did not sign the residency termination document, which under UAE labor law, is required to be signed by the foreign worker prior to termination of residency. If

signed, which it was not, the document also would acknowledge no labor payments were outstanding.

50)     On July 18, 2012, Sh. Faisal signed a letter of recommendation for El Omari, stating his employment with the RAKFTZA was from March 1997 to June 30, 2012.

51)     On December 1, 2012, Sh. Faisal, was still Chairman of the RAKFTZA, and retained the consulting services of El Omari as an advisor, under an agreement between GDS & Investment, a UAE corporation, (by El Omari) and the RAKFTZA (by Sh. Faisal), ("the GDS Agreement").

## G.  The 2013 Removal of Sh. Faisal as Chairman of RAKFTZA by Sh. Saud, and appointment of their younger brother, Sh. Ahmed.

52)     On March 5, 2013, Sh. Saud issued a decree which removed Sh. Saud's brother, Sh. Faisal as Chairman and from the board of the RAKFTZA, and appointed in his place, their younger brother, Sheikh Ahmed Bin Saqr Al Qasimi ("Sh. Ahmed"), as Chairman of the RAKFTZA. Sh. Ahmed continues as Chairman to the present date. This public removal by Sh. Saud of Sh. Faisal, and replacement by his younger brother, Sh. Ahmed, was a disgrace of Sh. Faisal in front of the tribes of the small emirate of  Ras Al Khaimah.

53)     Under a personally signed letter dated  March 17, 2013, Sh. Ahmed, the new Chairman of RAKFTZA, terminated the 3 month old GDS Agreement, effective that date, citing false allegations against El Omari, to Wit:  "GDS proved gross negligence … resulting in unjustified financial spending's [sic] and loss of profit". False allegations which have never been documented or otherwise proved in any subsequent RAK Rulers Court civil and criminal cases filed against El Omari in retaliation.

54)     Upon advice of his UAE attorneys, El Omari took three recommended steps to exhaust his remedies under UAE law, to Wit: 1) El Omari wrote to the RAKFTZA asking for

payment of his end of services gratuity, to which there was no response, 2) El Omar wrote to Sh. Saud asking for payment of his end of services gratuity, to which there was no response, and 3) On June 24, 2013, El Omari, by and through his UAE attorneys, submitted a request to the RAK Rulers Court for a clearance certificate to sue the RAKFTZA, which was first admitted received by the Rulers Court for processing, and then later the Rulers Court claimed to have never received the filing.

55)     On October 22, 2015, the RAKFTZA filed Articles of Dissolution of its New York promotion office, the RAK Dubai Business Centre, under authorization of and personal signature of Sh. Ahmed, the present Chairman of the RAKFTZA, which was filed with the New York Department of State.

56)     After the TAG White Paper was delivered and his termination from the RAKFTZA, El Omari has been unable to find similar employment, has suffered out of pocket expenses, emotional distress, loss of earnings, and damage to his reputation.

57)     The RAKFTZA, under Sh. Ahmed as Chairman, and the RAK Rulers Court, have denied El Omari due process of law, and have otherwise made invoking the jurisdiction of the RAK Rulers Court to resolve any contract claims an impossibility, and thus the contracted choice of jurisdiction clause in the Agreement is void.

58)     El Omari now files the present complaint invoking the jurisdiction of this court.

59)     Subsequent to filing the original Complaint, on Sunday, July 31, 2016, the day before RAKFTZA filed a pre-motion letter to dismiss the Complaint, El Omari was subjected to an incident on U.S. soil caused by and through Sh. Saud in retaliation for filing the Complaint, to Wit:

a)      Upon landing by commercial flight at 5:55 pm, Sunday, July 31, 2016, at JFK Airport in New York, from an international trip, an unprecedented incident occurred at U.S. Customs. Sh. Saud had caused UAE authorities to request U.S. authorities to arrest El Omari in the U.S., and send El Omari to the UAE, where there is not an independent judiciary and where arbitrary arrests and detentions are well known by the U.S. Department of State. There is no extradition treaty between the UAE and the U.S. El Omari was detained, but not arrested, during this incident, was advised not to travel to the UAE, missed his connecting flight home, and stayed overnight in New York. Had the UAE request been honored by U.S. Customs, in light of the human rights position of the U.S. Department of State on the UAE, it is likely that El Omari would not have been heard of again.

b)      More specifically, after arrival and when passing through U.S. Customs at JFK Airport, El Omari, the Customs questions turned to the UAE, and the Customs officer ("Customs officer No. 1"), while looking at a computer screen, stated that El Omari "must have serious problems with the UAE."  The Customs officer No. 1 further stated that "you had better be careful and not go to the UAE," "they will arrest you and put you in jail," "by the way, we do not have any exchange treaties with them, but you be careful."

c)      Customs officer No. 1 then detained El Omari and took El Omari to a separate room involving U.S. Homeland Security. A different Customs officer ("Customs officer No. 2"), took El Omari's U.S. passport and entered information into a computer, and looked perplexed at what she saw on the screen, causing Customs officer No. 2 to pause and stare at the screen for a while, not knowing

what to do. After a few minutes, Customs officer No. 2 picked up a phone and called someone, and kept repeating information about El Omari. Customs officer No. 2 hung up the phone, waited a few minutes, and called again and had a few minutes further conversation. Following this second phone call, Customs officer No. 2 called El Omari's name to where he was sitting, stamped El Omari's paper, and handed El Omari his U.S. passport.

d)      El Omari left the room with another U.S. Customs officer ("Customs officer No. 3") who checked El Omari's luggage, and El Omari left the airport.

e)      El Omari missed his connecting flight home to North Carolina, and stayed overnight in New York.

f)      All causing extreme emotional distress to El Omari.

### CAUSES OF ACTION

### Count I
### (As Against Defendant, Ras Al Khaimah Free Trade Zone Authority)
### Breach of Contract

60)      El Omari repeats the previous paragraphs as if fully and completely restated herein.

61)      El Omari and the RAKFTZA did enter into the Agreement, dated April 1, 1998, which provided for, *inter alia*, an indefinite period of labor services, a 2 month notice requirement prior to termination, and an end of service gratuity to be calculated under UAE Labour Law No. 8 of 1980, as amended, to be paid upon termination.

62)      The RAKFTZA did breach the Agreement on May 28, 2012, by: 1) terminating the Agreement with only 1 month notice with an effective date of June 30, 2012, and 2) failing to

pay any end of service gratuity under UAE Labour Law No. 8 of 1980, as amended, all of which

remains due and owing.

63)     The choice of jurisdiction clause in the Agreement for resolving claims and

disputes under the Agreement is void as an impossibility and violates due process.

64)     All to the injury of El Omari.

***Count II***
**(As Against Defendant, Kreab (USA) Inc.)**
***Fraud***

65)     El Omari repeats the previous paragraphs as if fully and completely restated

herein.

66)     Kreab (USA) Inc.'s fraudulent scheme was composed of acts and omissions

misrepresenting material facts about the commissioning, preparation, purpose, and payment of a

false smear report (the TAG White Paper), knowledge of the falsity of the TAG White Paper on

its face and as applied to the facts, knowledge of and engaging in the scheme, the reasonable

reliance by El Omari and others on Kreab's acts, being a proximate cause of termination of the

Agreement, and injury to El Omari:

> (a) Kreab, by and through its employee and/or partner, Andrew Frank, engaged in
>       a fraudulent scheme after Kreab submitted an unsuccessful public relations
>       proposal to the RAKFTZA for the United States market on November 20,
>       2009 (the Kreab Proposal), where, Kreab did cause the preparation and
>       delivery of a false smear report on the operations of the RAKFTZ, to
>       fraudulently generate demand for a second and more lucrative public relations
>       proposal for the United States market (the Strategy XXI Proposal), to repair

the anticipated tainted reputation of the RAKFTZ to be caused by the false smear report.

(b) Kreab, by and through Andrew Frank, did cause the commission of The Arkin Group LLC (TAG) to prepare and deliver the smear report on RAKFTZ operations, and Frank did deliver the TAG White Paper on April 25, 2011, for which Kreab was paid a US$35,000 fee, and Kreab knew the TAG White Paper falsely stated that TAG's services were commissioned by the RAKFTZA, a falsity on its face, being a report not commissioned by El Omari, CEO & Director General of the RAKFTZA, and the TAG White Paper was otherwise false and misleading in its facts and negative analysis.

(c) Kreab, by and through Andrew Frank, after delivering the TAG White Paper to the RAKFTZA on April 25, 2011, did cause the Kreab Proposal to be resubmitted to the RAKFTZA, in the form of the Strategy XXI Proposal on July 7, 2011, for a proposed fee of US$15,000 per month.

(d) El Omari and others at the RAKFTZA reasonably relied on Kreab's acts to be truthful.

(e) The TAG White Paper was a proximate cause of El Omari's termination from the RAKFTZA, and subsequent injuries to El Omari.

67)     All to the injury of El Omari.

### Count III
### (As Against Defendant, Sheikh Saud bin Saqr Al Qasimi,
### in his individual, and official capacity)
### Fraud

68)     El Omari repeats the previous paragraphs as if fully and completely restated herein.

69) Sheikh Saud bin Saqr Al Qasimi ("Sh. Saud"), in his individual, and official, capacity, acted unlawfully under the labor and other laws of the UAE, and acted unlawfully under the laws of the United States, being a proximate cause of the fraud and the termination of El Omari.

70) Sh. Saud's acts in furtherance of Kreab (USA) Inc.'s fraudulent scheme were composed of acts and omissions misrepresenting material facts about the commissioning, preparation, purpose, and payment of a false smear report (the TAG White Paper), knowledge of the falsity of the TAG White Paper on its face and as applied to the facts, knowledge of and engaging in the scheme, the reasonable reliance by El Omari and others on Kreab's acts, being a proximate cause of termination of the Agreement, and injury to El Omari:

(a) Sh. Saud's acts in furtherance of Kreab, by and through Kreab's employee and/or partner, Andrew Frank, engaged in a fraudulent scheme after Kreab submitted an unsuccessful public relations proposal to the RAKFTZA for the United States market on November 20, 2009 (the Kreab Proposal), where, Kreab did cause the preparation and delivery of a false smear report on the operations of the RAKFTZ, to fraudulently generate demand for a second and more lucrative public relations proposal for the United States market (the Strategy XXI Proposal), to repair the anticipated tainted reputation of the RAKFTZ to be caused by the false smear report.

(b) Sh. Saud's acts in furtherance of Kreab, by and through Andrew Frank, did cause the commission of The Arkin Group LLC (TAG) to prepare and deliver the smear report on RAKFTZ operations, and Frank did deliver the TAG White Paper on April 25, 2011, for which Kreab was paid a US$35,000 fee,

and Kreab knew the TAG White Paper falsely stated that TAG's services were commissioned by the RAKFTZA, a falsity on its face, being a report not commissioned by El Omari, CEO & Director General of the RAKFTZA, and the TAG White Paper was otherwise false and misleading in its facts and negative analysis.

(c) Sh. Saud's acts in furtherance of Kreab, by and through Andrew Frank, after delivering the TAG White Paper to the RAKFTZA on April 25, 2011, did cause the Kreab Proposal to be resubmitted to the RAKFTZA, in the form of the Strategy XXI Proposal on July 7, 2011, for a proposed fee of US$15,000 per month.

(d) El Omari and others at the RAKFTZA reasonably relied on Kreab's acts to be truthful.

(e) The TAG White Paper was a proximate cause of El Omari's termination from the RAKFTZA, furthered by Sh. Saud, and subsequent injuries to El Omari.

(69)     All to the injury of El Omari.

### Count IV
**(As Against Defendant, Sheikh Saud bin Saqr Al Qasimi,**
**in his individual, and official capacity)**
*Intentional Infliction of Emotional Distress*

71)     El Omari repeats the previous paragraphs as if fully and completely restated herein.

72)     Sheikh Saud bin Saqr Al Qasimi ("Sh. Saud"), in his individual, and official, capacity, acted unlawfully under the laws of the UAE, and acted unlawfully under the laws of the United States, and in retaliation against El Omari for filing the original Complaint, and with the intent to retaliate, punish, silence, intimidate, and remove El Omari from the U.S., did, between

May 25, 2016 and July 31, 2016, cause an illegal, and arbitrary and capricious, communication to U.S. Customs of a request for El Omari to be arrested in New York and sent to and jailed in the UAE.

73)     Sh. Saud's acts in furtherance of this unlawful scheme to retaliate, punish, silence, intimidate, and remove El Omari from the U.S. was extreme and outrageous conduct, had the intent to cause, or disregard of a substantial probability of causing, severe emotional distress to El Omari, and was a proximate cause of extreme emotional distress to El Omari. Acts so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

74)     All to the injury of El Omari.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff, Oussama El Omari, seeks the following Relief:

*As to Count I*

1)     US$10,000,000 in compensatory and consequential damages:

   *(a)* end of service monies due and owing,

   *(b)* out of pocket expenses,

   *(c)*  lost earnings,

   *(d)* emotional distress,

   *(e)* damage to reputation,

2)     Punitive damages,

3)     Interest,

4)     Attorney fees and expenses, and court costs, and

5)     Such further and other relief as the Court deems just and proper.

***As to Count II***

    1)    US$10,000,000 in compensatory and consequential damages:

        *(a)* end of service monies due and owing,

        *(b)* out of pocket expenses,

        *(c)*  lost earnings,

        *(d)* emotional distress,

        *(e)* damage to reputation,

    2)    Punitive damages,

    3)    Interest,

    4)    Attorney fees and expenses, and court costs, and

    5)    Such further and other relief as the Court deems just and proper.

***As to Count III***

    1)    US$10,000,000 in compensatory and consequential damages:

        *(a)* end of service monies due and owing,

        *(b)* out of pocket expenses,

        *(c)*  lost earnings,

        *(d)* emotional distress,

        *(e)* damage to reputation,

    2)    Punitive damages,

    3)    Interest,

    4)    Attorney fees and expenses, and court costs, and

    5)    Such further and other relief as the Court deems just and proper.

*As to Count IV*

    1)    US$10,000,000 in compensatory and consequential damages:

        *(a)* emotional distress,

        *(b)* other and further compensatory and consequential damages,

    2)    Punitive damages,

    3)    Interest,

    4)    Attorney fees and expenses, and court costs, and

    5)    Such further and other relief as the Court deems just and proper.

Dated: New York, New York
       August 5, 2016

MOORE INTERNATIONAL LAW PLLC.

/s/ Scott M. Moore
By: _____
Scott Michael Moore, Esq.
*Attorneys for Plaintiff, Oussama El Omari*
45 Rockefeller Plaza, Suite 2000
New York, New York 10111
T. (212) 332-3474
F. (212) 332-3475
E. smm@milopc.com