UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

OUSSAMA EL OMARI,
an individual and United States Citizen residing in the
State of North Carolina,

                       Plaintiff,

      -against-

RAS AL KHAIMAH FREE TRADE ZONE
AUTHORITY, a/k/a R.A.K. FREE TRADE
ZONE AUTHORITY, a/k/a RAKFTZA,
a corporation organized under the laws of
Ras Al Khaimah, United Arab Emirates,

KREAB (USA) INC., a corporation
organized under the laws of the State
of New York,

SHEIKH SAUD BIN SAQR AL QASIMI,
an individual and United Arab Emirates
Citizen, residing in the United Arab
Emirates, and Emir of Ras Al Khaimah,
United Arab Emirates, sued in his
individual, and official capacity, and

THE ARKIN GROUP LLC, a limited
liability company organized under the
laws of the State of New York,

                    Defendants.

Case No.: 1:16-cv-3895 (NRB)(SN)

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RULE 60(b)(6) MOTION TO REOPEN AS TO DEFENDANT SHEIKH SAUD BIN SAQR AL QASIMI**

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ...................................................................................................................... 1

ARGUMENT ............................................................................................................................ 1

    I. The Page Affidavit is Undisclosed Evidence Creating an Extraordinary Circumstance ......... 7

    II. The Change in Federal Policy Produces an Extraordinary Circumstance ........................... 10

    III. This Rule 60(b)(6) Motion for Relief From Judgment is Presented Within a Reasonable

    Time ...................................................................................................................................... 16

        A. El Omari Satisfies His Burden of Proof for Relief Under Rule 60(b)(6) ......................... 17

    IV. The Change in Intervening Law and the Revelation of Undisclosed Evidence Constitute a

    Change in Circumstances so Extraordinary as to Merit Relief under Rule 60(b)(6). ............... 18

RELIEF REQUESTED ............................................................................................................ 19

## PRELIMINARY STATEMENT

On August 18, 2017, Your Honor dismissed Oussama El Omari's ("Plaintiff" or "El Omari") claims of intentional infliction of emotional distress against Sheikh Saud bin Saqr al Qasimi ("Sh. Saud") due to his sovereign foreign official immunity. Plaintiff respectfully requests relief from the judgment pursuant to FRCP 60(b)(6) as against said Defendant.

## BACKGROUND

In 1998, El Omari began his employment with the pre-Ras Al Khaimah Free Trade Zone Authority ("RAKFTZA"). Amended Compl. ("AC"), par. 21. (ECF No. 30). El Omari worked closely with the chairman of RAKFTZA, Sheikh Faisal al Qassimi ("Sh. Faisal"). *Id* at par. 23. Throughout his tenure, El Omari received salary increases and promotions. *Id*. In 2010, Crown Prince Sh. Saud succeeded his father Sheikh Saqr al Qassimi. *Id* at par. 28. Sh. Faisal is brother to Sh. Saud. Beginning in 2009, a public relations proposal was nominally floated to El Omari which began a review project that El Omari alleged falsely discredited him as a pretext for dismissal. Individuals involved in the review project included Andrew Frank ("Frank") and Amir Handjani ("Handjani").

In 2010, Crown Prince Sh. Saud succeeded his father Sheikh Saqr al Qassimi. (*Id* at par. 28). Immediately after Sheikh Saqr's death, Sh. Khalid, Sh. Saud's older half-brother, challenged the legitimacy of Sh. Saud's succession. See, Sylvie Stein, *Exiled Emirate Prince Plans Coup with British Lawyer*, Foreign Pol'y, June 10, 2010, url:https://foreignpolicy.com/2010/06/10/exiled-emirate-prince-plans-coup-with-british-lawyer/. Sh. Khalid attempted a coup by alleging Ras al Khaimah ("RAK") had political and economic connections to Iran. See, Simon Henderson, *The Iran*

*Angle of Ras Al-Khaimah's Succession Struggle*, [1714] Wash. Inst. for near E. Pol'y Analysis, Oct. 29, 2010, url: https://www.washingtoninstitute.org/policy-analysis/iran-angle-ras-al-khaimahs-succession-struggle.

These allegations were extraordinarily serious. Connections with Iran would bring not only the ire of the international community, but of the other Gulf Country Council ("GCC") members. Abdullah Baabood, The Middle East's New Battle Lines: *Qatar, Kuwait, and Oman*, European Council on Foreign Relations, May 2018, url: https://ecfr.eu/archive/page/-/The_Middle_Easts_New_Battle_Lines.pdf. Saudi Arabia and Iran have tenuous relations if any at all. *Id*. Saudi Arabia, as the gulf region's principal contender with Iran primarily dictates the underlying policies of the GCC, which consequently is remarkably anti-Iran. Samuel Ramani, *The Qatar Blockade Is Over, but the Gulf Crisis Lives on*, Foreign Pol'y, Jan. 27, 2021, url: https://foreignpolicy.com/2021/01/27/qatar-blockade-gcc-divisions-turkey-libya-palestine/. As such, any UAE official's business relationships, diplomatic relations, or mutual economic ties with Iran would be reason to remove said official from their office to prevent political conflict with Saudi Arabia. *See* Simon Henderson, *The Iran Angle of Ras Al-Khaimah's Succession Struggle*, [1714] Wash. Inst. for near E. Pol'y Pol'y Analysis. Allegations of ties with Iran are sufficient, not only for removal from office, but to label an individual as a political dissident. In fact, Qatar suffered an embargo and blockade in 2017 lasting until January 2021 for its then developing political and economic ties with Iran. Samuel Ramani, *The Qatar Blockade Is Over, but the Gulf Crisis Lives on*, Foreign Pol'y, Jan. 27, 2021. The effects of the GCC blockade were felt even by the Qatari elite. *Id*. Thus Sh. Khalid's allegations were a direct and immediate threat to Sh. Saud's power and status.

In an effort to consolidate power, Sh. Saud began a systemic wipe out of the old regime, placing political allies in key positions. AC, par. 53. Sh. Faisal, Sh. Saud's half-brother, was not only an important member of the RAK economy but also a key player in the Sh. Saud and Sh. Khalid conflict. *Id*; See, Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life,* Washington Post. (Dec. 19, 2018). Starting October 2010, Sh. Saud began plans to secure his position and prevail over the instability caused by Sh. Khalid's attempted coup. *Id*. As a strong political opponent, especially one who was not loyal during the succession feud, Sh. Faisal became a target for political reprisal. *Id.* El Omari alleged that Sh. Saud subsequently directed Handjani to contact others and begin a sham investigation of RAKFTZ. *Id*.

The alleged sham project concluded that RAKFTZ had ties to US and UN sanctioned Iranian companies and various factual errors. These false allegations of economic ties with Iran were condemnatory. Sh. Faisal, as the chairman of RAKFTZA, would be responsible for any such economic relationships and thus could be justifiably stripped of his position. *Id* at par. 29. Anyone in connection with such ties, would also be targets for political reprisal. Handjani then emailed a draft of the project to El Omari, Sh. Saud, and Sh. Faisal. El Omari, with RAKFTZA legal counsel, emailed Frank in an effort to remedy the legal and factual errors. *Id* at par. 40. When the email produced no change, El Omari and legal counsel traveled to Frank's New York office. *Id* at par. 41.

The New York meeting proved unsuccessful. *Id* at 41. Despite knowledge of the factual errors, particularly those concerning ties to Iran, Frank emailed the uncorrected project paper to El Omari. *Id* at 42. Six days later, Frank notified El Omari that he was planning to meet with both Sh. Saud and Handjani. *Id* at 43. After this meeting, the project paper was officially delivered to Sh. Saud with the false allegations of economic ties to Iran. *Id* at 44. It was after this

delivery that Sh. Saud called El Omari himself. *Id*. Sh. Saud instructed El Omari to pay for the project paper out of RAKFTZA funds. *Id*. El Omari once again objected as neither he, Chairman Sh. Faisal, nor RAKFTZA itself commissioned the project paper. *Id*. Despite his protests, Sh. Saud insisted that the payment come from RAKFTZA funds. *Id*. El Omari then paid for the project paper, which included false allegations concerning nonexistent ties with Iran, from RAKFTZA funds as Sh. Saud instructed.

In 2012, Sh. Saud requested the termination of El Omari without the approval of the acting chairman, Sh. Faisal. *Id* at par. 47-48. Sh. Saud's termination letter refused to honor the legally and contractually required end of service gratuities. *Id*. Instead Sh. Saud gave El Omari a mere one month's notice. *Id*. Despite Sh. Faisal's disapproval of El Omari's termination, Sh. Saud terminated El Omari's residency a month later. *Id* at par. 50. Sh. Saud's decision to terminate El Omari's employment and his residency status, forced him to leave the UAE, including his family who lived there. See, Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life*. For a time, El Omari left the UAE but continued his working relationship with RAKFTZA and Sh. Faisal. AC at par. 52.

In 2013 after being falsely accused of economic ties with Iran, Sh. Saud publicly removed Sh. Faisal as chairman of RAKFTZA. *Id* at par. 53. Sh. Faisal was replaced by Sh. Saud's younger brother, Sheikh Ahmed Bin Saqr Al Qasimi ("Sh. Ahmed"). *Id*. Sh. Saud had thus secured his political position in RAK economics and triumphed over a political opponent. See, Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life*. Upon the removal of Sh. Faisal, Sh. Saud falsely accused El Omari of negligence and corruption resulting in loss of profit. AC at par. 54. Sh. Saud's allegations subjected El Omari to criminal and civil trials; none of which proved the Ruler's allegations. *Id*. El Omari began litigation in the

UAE to retrieve his end of service gratuity and relief from the violation of his contractual rights. *Id* at par. 55. None of these civil cases were accepted by RAK courts, which are controlled by Sh. Saud. *Id* at par. 55, 58. As a result of his civil actions in the UAE, he was tried and convicted of crimes in the UAE *in absentia*. *Id* at par. 19(d). His brother, a resident in the UAE, has likewise been denied an exit visa. Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life*.

In 2016, El Omari was traveling home from an international trip. AC at par. 60(a). While in Customs at JFK airport, El Omari was questioned about his relations with the UAE. *Id*. El Omari was subsequently detained by Customs officers, questioned, and his luggage was searched. *Id* at par. 60(a), (d). The reason for his detention was an INTERPOL Red Notice ("Red Notice") requested by the UAE based on Saud's Ruler's Court. The Red Notice was submitted to INTERPOL subsequent his *in absentia* convictions based on Sh. Saud's allegations. See, Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life*. El Omari was released from his detention, despite the Red Notice. AC at par. 60(d).

El Omari has been unable to retract the Red Notice. See Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life*. The Red Notice which caused his detention prevents El Omari from leaving the USA as another nation may begin extradition proceedings possibly sending him back to the UAE to face Sh. Saud's wrath. See Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life*. More so, his brother has continued to be unable to leave the UAE. *Id*. El Omari not only misses him but worries for his safety. *Id*. The Red Notice posted by UAE due to Sh. Saud's allegations and trials caused not only a missed domestic flight home, but extreme emotional distress. AC at par. 60(e)-(f).

## THE PAGE AFFIDAVIT

In the United Kingdom courts, there are computer hacking proceedings involving Sh. Saud brought by Farhad Azima ("Azima") against the Ras Al Khaimah Investment Authority ("RAKIA"). RAKIA is controlled by Sh. Saud as Ruler of Ras Al Khaimah and its Chairman. Stuart Page ("Page"), a former intelligence contractor for Sh. Saud, submitted an affidavit on behalf of Azima. Therein, Page describes a scheme to defraud the UK Court. Aff. of Stuart Robert Page, January 6, 2022, annexed hereto as Exhibit 1. Recently, RAKIA "withdrew" from participation in the UK litigation. Letter, RAKIA to Judge, June 22, 2022, annexed hereto as Exhibit 2.

In 2015, Page, the head of a private investigation company, was employed by Sh. Saud to investigate Khater Massaad ("Khater"). Page Aff., par. 6. Khater was Sh. Saud's closest advisor. *Id*. In collaboration with Neil Gerrard of Derchert LLP, Jamie Buchanan (an employee of RAK), and Handjani, Page began providing reports on Khater for and to Sh. Saud. *Id* at par. 7, 30. During his investigation Page began working with a person named Amit of the Israeli business Insight to better spy on Khater. *Id* at par. 9. Since the investigation was on behalf of Sh. Saud, it had to be secretive *Id* at par. 18-19. To do so Page and his associates used only one email account to ensure the lack of a paper trail. *Id*. Sh. Saud instructed Page to never send him any electronic messages. *Id* at par. 24. In fact, in lieu of electronic or mail communications Page met with Sh. Saud every three to four weeks. *Id*. Page would then give Sh. Saud a personal account of information recovered during the investigation. *Id* at 25. Page was also notified that every four to six weeks Jamie Buchanan would meet with Frank, Handjani, and Neil to discuss Page's investigation and RAK's litigation. *Id* at par. 30.

In 2016, Amit retrieved and shared Farhad Azima's confidential data. *Id* at par. 33. According to Page, Azima's stolen confidential data was used in 2018 during proceedings between Azima and Ras Al Khaimah Investigation Authority ("RAKIA"). *Id* at par. 34. Amit, Neil, and Jamie had concerns regarding disclosure of the methods of retrieving Azima's data. *Id* at par. 35. The concern arose out of Amit and his investigation team's Israeli citizenship and military background. *Id* at par. 35. As the UAE had not yet engaged in any such relationships with Israel, a revelation that Sh. Saud was working with Israeli companies may damage his political reputation. *Id* at par. 35. In 2018, David Hughes (a former partner at Neil's firm), Neil, Jamie, Amit, Page, and a journalist named Majdi met in Cyprus. *Id* at par. 38. At this meeting, the individuals agreed that Majdi would provide a cover story as to how Azima's data was retrieved. *Id*. Page describes in detail how the false testimony was later practiced at a mock trial in a secretive hotel in Bern, Switzerland, with Neil role-playing judge and cross-examining attorney. Jamie was not present at the mock trial at the direction of Sh. Saud due to Sh. Saud's concern about secrecy because he had terminated Jamie before the mock trial took place. The parties carried out the false testimony at the UK trial.

## ARGUMENT

### I. The Page Affidavit is Undisclosed Evidence Creating an Extraordinary Circumstance

Federal Rule of Civil Procedure 60(b)(6) provides relief from judgment in extraordinary circumstances where rejecting relief would produce an undue hardship. Fed. R. Civ. P. 60(b)(6); *Oneida Indian Nation of New York v. County of Oneida*, 214 F.R.D. 83 (N.D. N.Y. 2003). Relief may be granted where there has been an exceptional change in circumstances. *Floyd v. City of New York*, 813 F. Supp. 2d 457, 470, n.116 (S.D.N.Y. 2011) (citing *Computer Professionals for Social Responsibility v. U.S. Secret Service*, 72 F.3d 897, 33 Fed. R. Serv. 3d 724 (D.C. Cir.

1996), amended, (Feb. 20, 1996)). An exceptional change in circumstances sufficient for relief

may be the emergence of undisclosed evidence. *Id*. Undisclosed evidence is not newly

discovered evidence provided for in Rule 60(b)(2). Newly discovered evidence is evidence

which despite due diligence could not have been discovered previously. *Metzler Inv. GmbH v.*

*Chipotle Mexican Grill, Inc.*, 970 F.3d 133, 146–47 (2d Cir. 2020). Conversely, undisclosed

evidence arises out of extraordinary circumstances, like where an affected third party clarifies

underlying facts crucial to the previous decision. *Computer Professionals for Social*

*Responsibility*, 72 F.3d at 33. As such, undisclosed evidence is that which is central to the

litigation so as to warrant a reconsideration of the previous judgment. *Id*. Further, undisclosed

evidence contains facts which call into question the facts which informed the original judgment.

*Id*.

The Affidavit submitted with this motion for reconsideration is undisclosed evidence.

The testimony in the Affidavit is demonstrative of Sh. Saud's use of UAE legal systems to target

perceived political dissidents. Page Aff., at par. 6-8(5), 34. It demonstrates how Sh. Saud

attempts to avoid accountability by misusing the courts of other countries. *Id* at par. 46. The

Affidavit is not merely cumulative and impeaching. The evidence demonstrates a pattern of

behavior that bolsters the claims made by El Omari. Most importantly, however, the Affidavit is

evidence that Sh. Saud targeted individuals for their relationships with his political rivals, thus

treating them as political dissidents.

El Omari alleges that Sh. Saud used the UAE courts and the INTERPOL Red Notice to

target and intimidate him. AC. at par. 19(d), 60(a)-(f). This Court earlier ruled that Sh. Saud

utilized these systems legally by and through his official position for the purpose of his official

duties. *Omari v. Ras Al Khaimah Free Trade Zone Auth.* , No. 16 CIV. 3895 (NRB), 2017 WL

3896399, at *10 (S.D.N.Y. Aug. 18, 2017). The Page Affidavit, however, offers conflicting evidence opposing this conclusion. The Affidavit details Sh. Saud's order to target a political rival in an effort to further his personal goals. Page Aff. at par. 34. Like Sh. Faisal, Khater was an impediment to Sh. Saud. With both men, Sh. Saud ordered an investigation to oust the individual and publicly discredit them. *Id* at par. 6; AC, at par. 29. The Affidavit brings forth a new fact from a Sh. Saud inner circle confidant and eyewitness, Sh. Saud targeted Khater and his affiliates, namely Azima. Page Aff. at par. 6, 34. This story is a direct parallel to El Omari's. Sh. Saud targeted Sh. Faisal, with whom El Omari held close personal and professional ties. When Sh. Faisal was publicly terminated from his position with RAKFZA, El Omari experienced a campaign of intimidation. AC. at par. 19(d), 60(a)-(f). This intimidation may have been through the legal systems of UAE courts and INTERPOL but was done for the express purpose of targeting and silencing El Omari for Sh. Saud's personal purposes. The Affidavit serves to demonstrate that Sh. Saud used his position to punish and intimidate others for his own personal gain.

A similarly affected third party has like facts and like circumstances and has presented evidence of the veracity of Sh. Saud's practice of targeting perceived dissidents. Had these facts been available at the time of the judgment in *El Omari v. Ras Al Khaimah Free Trade Zone Authority*, this court would not have considered Sh. Saud's actions to be within the scope of his official duties. The Page Affidavit creates an exceptional circumstance; Sh. Saud has a pattern of targeting perceived dissidents for his personal purposes. As evidenced by the Affidavit, he did so for his own personal gain and not for the furtherance of his official duties. As this evidence demonstrates a personal motive outside the scope of his official duties, the Affidavit is

undisclosed evidence so crucial to the former litigation that it warrants relief under Rule 60(b)(6).

## II. The Change in Federal Policy Produces an Extraordinary Circumstance

Relief may also be granted where there is change in decisional law. *Scott v. Gardner*, 344 F. Supp. 2d 421, 426 (S.D.N.Y. 2004). A mere change in underlying decisional law is not sufficient to grant relief. *Agostini v. Felton,* 521 U.S. 203, 239, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997). The 'new law' must be "beyond any question inconsistent" with the decision. *Scott*, 344 F. Supp. 2d at 426. In order to satisfy this high bar, the change in law must be critical, if not foundational, to the law relied upon in the prior decision. *Id*.

In the case of *El Omari v. Ras Al Khaimah Free Trade Zone Authority*, the court relied on the silence of the Department of State. No. 16 CIV. 3895 (NRB), 2017 WL 3896399, at *10 (S.D.N.Y. Aug. 18, 2017), *aff'd sub nom. El Omari v. Kreab (USA) Inc.*, 735 F. App'x 30 (2d Cir. 2018). Due to the Department of State's silence, the Court correctly exercised its authority to determine whether such immunity exists. *Id*. (citing *Samantar v. Yousuf*, 560 U.S. 305, 325-26 (2010)). The crux of the Court's analysis is based on the Supreme Court's ruling in *Samantar v. Yousuf*. Therein, the Supreme Court indicates that the Department of State is the ultimate authority as to whether a foreign official retains sovereign immunity. *Samantar*, 560 U.S. at 311 (citing *Ex Parte Peru*, 318 U.S. 578, 581 (1943)). As such, the policy of the Department of State as to both the actions and status of foreign officials is controlling. *Id*.

As the direct authority as to sovereign foreign official immunity, a change in the administrative policy of the Department of State is a change in decisional law for the purposes of a Rule 60(b)(6). *Class v. Norton*, 507 F.2d 1058, 1062 (2d Cir. 1974) (stating that a change in administrative decisions may provide relief under rule 60(b)(6).). In a joint statement, the

Department of State and Department of Homeland Security detailed a policy to hold governments and their agents accountable for transnational repression. *Joint Departments of State and Homeland Security Roundtable Affirms U.S. Commitment to Accountability for Transnational Repression*, U.S. Department of State Media Note (2022), https://www.state.gov/joint-departments-of-state-and-homeland-security-roundtable-affirms-u-s-commitment-to-accountability-for-transnational-repression/.

Transnational repression defines actions taken by authoritarian regimes to oppress individuals both abroad and within the United States. *Tools of Transnational Repression: How Autocrats Punish Dissent Overseas*, *Hearing Before the Comm. on Sec. and Coop. in Eur.*, 116th Cong., CSCE 116-1-7, 1(2019) (statement of Hon. Roger F. Wicker, Co-Chairman, Comm. on Sec. and Coop. in Europe.). Authoritarian governments target perceived dissidents through cyber-hacking, surveillance, and intimidation. *Id*. A common tool of transnational repression is the abuse of INTERPOL. *Id*. Authoritarian regimes will frequently use INTERPOL as a resource to intimidate, harass, and extradite dissidents. *Id*. Politically motivated INTERPOL Red Notices are common tools used by authoritarians seeking to stabilize their rule against perceived opponents. *Id* at 14 (Alexander Cooley, Dir. at Colum. Univ.'s Harriman Institute for the Study of Russ., Eurasia and Eastern Eur. and Claire Tow Professor of Pol. Sci., Barnard College answering Hon. Marc Veasey, Comm'r, Comm. on Sec. and Coop. in Eur.).

The UAE requested an INTERPOL Red Notice for El Omari directly after his *in absentia* criminal trial. This trial occurred only after El Omari pursued lawsuits in the UAE to retrieve his employment benefits after his dismissal from RAKFZ in 2015. AC. at par. 19(d). The point which shifts the UAE's treatment of El Omari from normal government action to transnational repression is El Omari's relationship with Sh. Faisal. Sh. Saud has a demonstrable history of

11

targeting those he views as opposing his power. *Id*; Page Aff. at par. 6, 34-38. His brother, Sh. Faisal posed a threat to Sh. Saud's position. As chairman of RAKFZA, Sh. Faisal gained acclaim for the work of his agency. AC. at par. 23. Sh. Faisal's direction of RAKFZA is responsible, in part, for the diversification of Ras al Khaimah's economy. As chairman, Sh. Faisal retained an important seat in RAK's economy and politics. Further, Sh. Faisal was a political opponent in the 2010 succession conflict. Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my* Life. Sh. Saud thus began an investigation to fabricate foundationless facts and legal conclusions. AC at par. 40. Sh. Saud then utilized these falsehoods concerning Iranian ties to publicly remove of Sh. Faisal consequently consolidating his authority. *Id* at par. 53.

Evidence that Sh. Saud targets those he views as political rivals or challengers is bolstered by the Page Affidavit. Like Sh. Faisal and El Omari, Sh. Saud targeted Khater and his associate, Azima. Azima faced intimidation through various means in an effort to silence him. El Omari likewise faced intimidation through the use of Saud's Ruler's courts and the posting of an INTERPOL Red Notice. By his own account, El Omari fears leaving the U.S. lest he be extradited to the UAE to be punished for his political and social ties. See Oussama El Omari, *Interpol's "Red Notices" are Being Abused. One Ruined my Life.* Further, El Omari's brother has been virtually prohibited from leaving the UAE on El Omari's account. *Id*. This is not a difficult conclusion to draw as his brother was not denied an exit visa until after El Omari's *in absentia* convictions. *Id*. In a 2021 report on the UAE's influence and use of INTERPOL, a former UK Judge uses El Omari's situation to explain how the UAE has used INTERPOL as a tool of transnational repression. See Sir David Calvert-Smith, *Undue Influence: Interpol and the UAE* 1-48, 37, Int'l Human Rights Advisors, (April 7, 2021) url: https://static1.squarespace.com/static/5e1706a32328de09538395d7/t/617ff6a7dde89f281846a8b

2/1635776352236/UNDUE_INFLUENCE_THE_UAE_AND_INTERPOL. Considering not only El Omari's and Azima's similar experiences with Sh. Saud but the conclusion of a respected former UK Judge, Sh. Saud's actions are textbook applications of transnational repression.

"[The] practice of transnational repression constitutes a wholesale assault on the rule of law internationally." *Tools of Transnational Repression: How Autocrats Punish Dissent Overseas*, *Hearing Before the Comm. on Sec. and Coop. in Eur.*, 116th Cong., CSCE 116-1-7, 1(2019) (statement of Hon. Roger F. Wicker, Co-Chairman, Comm. on Sec. and Coop. in Europe.). The Department of State has stated as much, that the political use of INTERPOL is a violation of human rights. Diplomatic Note from Department of State to Foreign Diplomats and Missions, (July 1, 2022) url:https://www.state.gov/wp-content/uploads/2022/07/2022-07-01-Circular-Note-Counter-Transnational-Repression.pdf. In a press release, the Department of Justice unsealed several prosecutions against foreign government officials for transnational repression. *Assistant Attorney General Matthew Olsen Delivers Remarks at Press Conference Announcing Transnational Repression Charges*, Justice News, Department of Justice (2022), https://www.justice.gov/opa/speech/assistant-attorney-general-matthew-olsen-delivers-remarks-press-conference-announcing. In Assistant Attorney General Olson remarks, he asserted that transnational repression is "antithetical to fundamental American values" and that such repression "undermine[s] our democracy, our economy, and our institutions." *Id*. He went on to state that the U.S. will not tolerate such repression on its own soil. *Id*. Even more, the assistant attorney general declared that foreign governments cannot deny individuals the protection of U.S. law. *Id*. The FBI also makes clear that these abuses are violations of international and U.S. law. *Transnational Repression*, Fed. Bureau of Investigation , url: https://www.fbi.gov/investigate/counterintelligence/transnational-repression (last visited June

13

2022). Therefore, it is would be a miscarriage of justice, in light of the Page Affidavit and the Amended Complaint's factual allegations, to rule that the Department of State seeks to provide immunity for this behavior. The Department of Justice's prosecution of foreign government agents for transnational repression and the statements of the Department of State are indicative of the whole of the executive branch's policy; non-heads of state who commit such actions retain no immunity.

Further, Congress has spoken on the issue of INTERPOL misuse. See *Tools of Transnational Repression: How Autocrats Punish Dissent Overseas*, *Hearing Before the Comm. on Sec. and Coop. in Eur.*, 116th Cong., CSCE 116-1-7, 1(2019) (statement of Hon. Roger F. Wicker, Co-Chairman, Comm. on Sec. and Coop. in Europe.). Congress has also spoken on the issue of transnational repression vis á vis the Transnational Repression Accountability and Prevention ("TRAP") Act. TRAP, 22 U.S. Code § 263b. § 263b(a) regards acts of transnational repression, specifically the abuse of INTERPOL for political means, a violation of international human rights norms. TRAP § 263b(a). The passage of TRAP as a law and the ongoing hearings and investigations of the Helsinki Commission[1] give credence to the argument that the misuse of INTERPOL is a violation of common international legal norms.[2]

In conjunction with a change in law, a court should consider whether the "equities strongly favor" the movant. *Sargent v. Columbia Forest Prod., Inc.*, 75 F.3d 86, 90 (2d Cir. 1996). In this case, the equities are certainly in El Omari's favor. El Omari's claims were not

---

[1] The Helsinki Commission is a multinational commission designed to investigate and advise on issues in human rights and international law. U.S. Helsinki Commission, Commission on Security and Cooperation in Europe [CSCE], *The Human Dimension*, (last updated 2022) url: https://www.csce.gov/about-csce/helsinki-process-and-osce/human-dimension

[2] A government or government official's use of INTERPOL to target or harass individuals is forbidden by article three of INTERPOL's Constitution. Constitution of the International Criminal Police Organization [INTERPOL], art. 3, I/CONS/GA/1956 (2021).

denied for reasons other than Sh. Saud's immunity. *See Maradiaga v. City of New York*, No. 16 CIV. 8325 (GBD), 2022 WL 1782120, at *3 (S.D.N.Y. June 1, 2022). El Omari has not used Rule 60(b)(6) to avoid an appeal. Nor does El Omari use Rule 60(b)(6) to relitigate issues, as the claims were not fully litigated. Further, El Omari alleges a serious charge against Sh. Saud. He alleges that Sh. Saud has impermissibly utilized INTERPOL to target and harass him. El Omari has been grievously harmed by this behavior. As of the submission of this paper, the INTERPOL Red Notice has not been retracted. If El Omari were to fly out of the U.S., he faces the risk of extradition to the UAE. The restriction of his legal right, or liberty, to travel internationally is restricted by a credible fear of detainment. El Omari has effectively lost his ability to travel outside of the United States without fear of persecution by the UAE vis á vis Sh. Saud. Recently, El Omari was unable to travel internationally for his father's final illness and funeral. El Omari has thus been subjected to the ongoing knowledge that a powerful individual is targeting him for his political and professional relationships. The distress faced by El Omari has been unrecoverable due to Sh. Saud's immunity. Now that the Department of State's policy has changed, the equities favor El Omari.

Included in its analysis, a court should also consider whether the movant notified the court of a pending motion that may alter the decisional law. *Sargent*, 75 F.3d at 90. In *Sargent*, the movant notified the court of a pending case in their appeal papers. 75 F.3d at 90. In this case, there has been no notice provided to the Court regarding the possible change in decisional law. A court should also consider whether substantial time has passed between the earlier decision and the change in law. *Id*. In this case, more than four years have passed since the original decision. Even though these last two prongs of the *Sargent* test are not in El Omari's favor, this does not prevent a grant of relief. *Scott*, 344 F. Supp. 2d at 427. The four prongs found in *Sargent* are

balancing factors. *See Scott v. Gardner*, 344 F. Supp. 2d 421, 426 (S.D.N.Y. 2004). As such, where the balance of the factors in the movant's favor outweighs those not in her favor, relief is warranted. *Id*.

In *Scott v. Gardner*, Plaintiff moved for reconsideration under rule 60(b)(6) due to a change in intervening law. 44 F. Supp. 2d at 427. Like El Omari, Scott leveled serious charges against Defendant Gardner. *Id* at 428. The repercussions of the alleged actions seriously harmed the Plaintiff, like Sh. Saud's persecution has El Omari. *Id*. The change in law directly opposed the original judgment in Plaintiff's case. *Id* at 427-28. In *Scott*, the court found that the equities and the change in decisional law seriously outweighed the time disparity and lack of notice to the court. *Id* at 428. This conclusion was predicated on the severity of the harm and allegations as well as the firm change in decisional law. *Id*. As such, Scott's case warranted relief under Rule 60(b)(6). The change in the policy of the Executive Branch and the federal government as a whole, is concrete and foundationally different to the prior judgment in El Omari's case. Like *Scott*, El Omari's case merits reconsideration. Balancing all factors, the equities and the change in law favor relief under Rule 60(b)(6).

### III. This Rule 60(b)(6) Motion for Relief from Judgment is Presented Within a Reasonable Time

Rule 60(c)(1) requires a movant to submit their motion within a "reasonable time." Fed. R. Civ. P. 60(c)(1). Timeliness under FRCP 60(b)(6) is not contingent on the time which transpired. *Grace v. Bank Leumi Tr. Co. of NY*, 443 F.3d 180, 191 (2d Cir. 2006) ("In this case, we are interested less in the number of years from the time of judgment, than we are in what has happened in between.") (explaining that the events leading to the motion may make a 60(b)(6) motion timely.). As such a reasonable period of time for a 60(b)(6) motion is largely dependent

upon the circumstances. *P.T. Busana Idaman Nurani v. Marissa by GHR Indus. Trading Corp.*, 151 F.R.D. 32, 35 (S.D.N.Y. 1993). In *P.T. Busana Idaman Nurani*, defendants brought a 60(b)(6) motion to vacate judgment for prior counsel's mental illness. *Id*. Although two years passed in between the judgment and the motion, the Court considered the motion timely. *Id* at 35-36. The court reasoned that the movants were unable to request the relief due to their lack of knowledge. *Id* at 36. Likewise, the Page Affidavit submitted to UK courts in January 2022 discloses evidence which contradicts his claim of sovereign foreign official immunity. Further, the change in federal policy concerning transnational repression is recent. The circumstances leading to this motion provide ample reason for the delay as moving before these events would be impossible. *See Socialist Republic of Romania v. Wildenstein & Co. Inc.,* 147 F.R.D. 62, 65 (S.D.N.Y. 1993) (ruling that the delay was unreasonable due to insufficient justification). As such, El Omari's 60(b)(6) motion for relief from judgment is timely.

### A. El Omari Satisfies His Burden of Proof for Relief Under Rule 60(b)(6)

The burden of proof for a 60(b)(6) motion must be highly convincing. *Gater Assets Ltd. v. AO Moldovagaz*, 2 F.4th 42, 53 (2d Cir. 2021). The evidence produced by the Page Affidavit is highly convincing. It demonstrates a concerted clandestine effort to stifle evidence of harassment and the personal nature of Sh. Saud's actions. Further, the statements of policy made by the Executive Branch and the investigations conducted by Congress cannot be anything but highly convincing. They clearly express a policy which removes immunity from foreign officials for actions of transnational repression and the abuse of INTERPOL.

Second, a movant must demonstrate good cause for not acting sooner. *Id*. The Page Affidavit and its contents, and the subsequent withdrawal letter of RAKIA from the case, were unknown until their submission to the UK court in 2022. This, along with the very recent change

in federal policy, demonstrates good cause for not acting sooner as the ability to do so would be nearly impossible without the recent developments. Finally, the movant must demonstrate that neither party will be prejudiced by reopening the case. *Id*. Accepting this motion would not prejudice any party as there is a demonstrable lack of undue hardship on behalf of Sh. Saud. Undue hardship generally entails the destruction or loss of evidence. *Williams v. New York City Dep't of Corr.*, 219 F.R.D. 78, 86 (S.D.N.Y. 2003); *Davis v. Musler*, 713 F.2d 907, 916 (2d Cir. 1983). The denial of such a motion could lead to destruction of evidence in further effort to obfuscate the harassment of El Omari. As such, El Omari satisfies his burden of proof.

## IV. The Change in Intervening Law and the Revelation of Undisclosed Evidence Constitute a Change in Circumstances so Extraordinary as to Merit Relief under Rule 60(b)(6)

Where a movant can point to a change in the controlling law and the availability of new evidence relief is warranted. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). It is settled that "[i]ntervening developments in the law by themselves rarely constitute the extraordinary circumstances required for relief under Rule 60(b)(6)." *Agostini*, 521 U.S. at 239 (1997). El Omari has demonstrated extreme circumstances. The Affidavit is undisclosed evidence which demonstrates that Sh. Saud acted in his personal capacity to target perceived dissidents. This evidence coinciding with the recent federal government, namely the Department of State, change in policy concerning immunity in situations of transnational repression, produces an extreme circumstance. Taken as a whole, circumstances have significantly changed as to Sh. Saud's sovereign foreign official immunity. Even more, the change in circumstances has produced an undue hardship for El Omari. His ability to travel freely and live without the encumbrance of worry for his safety is compounded by the revelations of the Affidavit. These circumstances constitute extreme circumstances

producing undue hardship and their recent development makes this motion timely, thus warranting relief from judgment.

## RELIEF REQUESTED

For the foregoing reasons, Plaintiff Oussama El Omari respectfully requests that the Court grant relief from judgment under Fed. R. Civ. P. 60(b)(6), to vacate the dismissal of his claims against Defendant Sheikh Saud bin Saqr al Qasimi and consider his claims.

Dated: August 29, 2022
New York, New York

Respectfully submitted,

MOORE INTERNATIONAL LAW PLLC

/s/ Scott M. Moore

Scott M. Moore, Esq.
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
(212) 332-3474
*Attorneys for Plaintiff Oussama El Omari*